1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DAVID WESLEY BIRRELL,                    No. 2:10-CV-1707-GEB-CMK-P
     aka BELLA-CHRISTINA BIRRELL,

12
                    Plaintiff,

13
           vs.                                 FINDINGS AND RECOMMENDATIONS

14
     KEITH HARLAN KNAUF, et al.,

15
                    Defendants.

16
     _____/

17

18              Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

19   42 U.S.C. §§ 1983 and 1985.   Pending before the court is defendants' motion for summary

20   judgment (Docs. 75 and 76).

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

# I. BACKGROUND

A.   **Plaintiff's Allegations**

This action proceeds on the first amended complaint (Doc. 15).  Plaintiff names the following as defendants: Keith Harlan Knauf, Dan Clanton, and Vimal Singh.  Plaintiff states that she[1] applied for membership in the Pastoral Care Services Program ("PCS") in October 2008.  Plaintiff states that this group is open to all inmates who meet certain custodial and other criteria.  According to plaintiff, she is qualified to be a member of the program, had been a member in the past, and had received "numerous citations during her previous tenure" with the program.  Plaintiff states that her application was submitted to defendant Knauf who, according to plaintiff, "covertly took advantage of the opportunity to completely circumvent the established and approved membership procedures and generated a denial of membership memorandum on October 20, 2008 . . . that contained intentionally false and depreciating [sic] misstatements of material facts that were used as a fraudulent basis to retaliate against the Plaintiff. . . ."  Plaintiff alleges that, during the time Knauf was reviewing plaintiff's application, she and Knauf were involved in ongoing litigation arising from a suit plaintiff filed against Knauf in 2006.

Plaintiff states that she was told by Knauf to submit a second application for the PCS.  Plaintiff adds that, shortly after submitting a second application, Knauf and defendant Clanton "did come together and agree to author and generate a CDCR Form 128-B 'Informational Chrono.'"  Plaintiff states that this chrono "again repeated and reiterated the very same . . . misleading statements. . . " as in the October 20, 2008, memorandum.  Plaintiff states that she was never provided a copy of this chrono but that the chrono, along with the October 20, 2008, memorandum, were "surreptitiously placed in Plaintiff's C-File for discovery at some unknown future date."  According to plaintiff, she did not discover these documents until September 2009 when she conducted a routine review of her central file.

---

[1]     Plaintiff is a male-to-female transgender person who prefers to be referred to using feminine pronouns.

Plaintiff next alleges that, after learning of the existence of the October 20, 2008, memorandum and 128-B chrono, she filed an inmate grievance seeking to have the documents removed from her file.  Plaintiff claims that, shortly after filing this grievance against Knauf, she was "unexpectedly summoned" to meet with a correctional counselor.  Plaintiff asserts that Knauf used this correctional counselor "to act in the capacity of his agent to interview the Plaintiff in regards to the claims . . . so as to 'shield' him [Knauf] from liability . . . ."  Plaintiff alleges that there was no legitimate reason to involve other prison staff in the grievance process.  Plaintiff states that defendant Knauf denied her grievance at the first informal level on September 30, 2009.  Plaintiff's grievance was denied at the second level by defendant Singh on December 7, 2009.

Plaintiff asserts the following claims:

| | | |
|---|---|---|
| Claim 1 | Defamation (against Knauf and Clanton). |
| Claim 2 | Violation of California Government Code § 11135. |
| Claim 3 | Equal protection. |
| Claim 4 | Retaliation. |
| Claim 5 | Due process. |
| Claim 6 | Conspiracy to deny civil rights. |

**B.     The Parties' Evidence**

Based on plaintiff's deposition, documents attached to the first amended complaint, as well as their own declarations and depositions, defendants assert that the following facts are undisputed:

1.  While in prison, plaintiff has been treated for depression and schizophrenia.

2.  Beginning in 2000, plaintiff began hormonal replacement treatment for a gender identity transformation.

3.  The Pastoral Care Services ("PCS") program is a state-funded program that provides end-of-life companionship for sick and dying inmates.

3

5.  During the relevant time period, defendant Knauf was an ordained minister, prison chaplain, and director of the PCS program; defendant Singh was the prison warden; defendant Clanton was a correctional sergeant.

6.  Inmates desiring to volunteer for the PCS program must complete an application and screening process and meet established criteria.

7.  Plaintiff was an inmate volunteer in the PCS at various times in years prior to 2008, including various times from 1996 through 2002.

8.  Criteria no. 8 for inmates wishing to volunteer for the PCS states: "No category I, J, K Mental Health Delivery system; nor CCMA or extensive psychiatric history."

9.  The PCS director may make an exception to criteria no. 8; such exceptions must be in writing an approved by the deputy warden.

10. All PCS inmate volunteers are required to sign a code of conduct; criteria 8 of the code of conduct states: "I will be sensitive to my client's extraordinary needs, especially their inability to always be sensible, reasonable, or grateful for my help. I will recognize my client's overwhelming physical and emotional burdens and will not allow my own feelings or agenda to distort my sensitivity;" criteria 3 of the code of conduct states: "I am an invited guest to our client's space. I will respect and accept without judgment the differences in my client's way of thinking compared to my own, including their beliefs, lifestyles, and attitudes."

11. Plaintiff signed the code of conduct in 1996 and understood that inmates volunteering in the PCS must abide by the code of conduct and respect the patients' rights.

12. Plaintiff applied for a position as a PCS volunteer in October 2008; that application was denied on October 20, 2008, for the following reasons, as outlined in a memorandum written by Knauf: (1) plaintiff did not follow visiting procedures; (2) plaintiff had manipulated her supervisor into violating a patient's right to die in comfort; and (3) plaintiff willfully disregarded a patient's wishes.

13. Knauf's October 20, 2008, memorandum denying plaintiff's PCS application was not intended as a disciplinary document; the memorandum was placed in the PCS program files and a copy was sent to plaintiff's central file.

4

14.   The October 20, 2008, memorandum denying plaintiff's PCS application was based on an incident in which plaintiff visited dying inmate Synthia Koopman, who considered plaintiff a "mortal enemy."

15.   Knauf believed that plaintiff had manipulated another staff member – McAtee – because, while plaintiff knew the rules regarding access to hospice patients, McAtee did not and McAtee at the time controlled access to the PCS wing; moreover, plaintiff had not signed the log books before entering the hospice.

16.   Defendant Clanton, who was responsible for the corridor where Koopman was located, knew inmate patient Koopman; during one of Clanton's routine rounds, he discovered Koopman in distress as a result of a recent unauthorized visit by plaintiff; Koopman complained to Clanton that plaintiff should not have been allowed to see her (Koopman) because they were enemies.

17.   Knauf and Clanton prepared a CDC Form 128(b) information "chrono" documenting the incident; the chrono was placed in plaintiff's central file.

18.   Plaintiff applied again for the PCS program in March 2009. That application was denied for the same reasons the prior application was denied.

19.   Instead of the PCS program, plaintiff was assigned to work in the prison law library.

19.   Plaintiff filed an inmate grievance seeking removal of Knauf's October 20, 2008, memorandum from her central file, claiming that the memorandum was disciplinary in nature and that she had not been afforded due process; the grievance was denied because the memorandum was not disciplinary in nature.

20.   Other transgender inmates and inmates with mental health problems had worked in the PCS; plaintiff does not have evidence of any transgender inmate being denied placement as a volunteer in the PCS program.

21.   No defendant ever told plaintiff that her application for the PCS program was denied because she is transgender, and Knauf's decision to deny plaintiff's applications was not based on her transgender status.

22.   Defendants deny conspiring to violate any of plaintiff's constitutional rights.

5

At their depositions, defendants each denied any agreement between or among them to deprive plaintiff of her constitutional rights.  Additionally, defendants each denied any discriminatory animus motivating their conduct.

In their motion, defendants note the following admissions made by plaintiff during the course of her deposition:

1.    Volunteers in the PCS program must abide by the patients' rights.

2.    Plaintiff has no evidence that other transgender individuals were denied access to the PCS program.

3.    Though she alleges that a written policy exists prohibiting individuals with mental health issues from accessing the PCS program, plaintiff has no evidence of the existence of such a written policy; nor does plaintiff have evidence of a verbal policy to that effect.

4.    Plaintiff lost no inmate rights or privileges as a result of either the Knauf memorandum denying her access to the PCS program, or the related 128 informational chrono.

5.    Plaintiff could not identify any violation of due process with respect to the denial of her application to be a volunteer in the PCS program.

6.    The only reason Singh is named as a defendant is because, as warden, he denied plaintiff's inmate grievance at the second level.

7.    Plaintiff's allegations concerning the existence of a conspiracy among defendants is based on speculation, and she has no evidence that anyone conspired against her.

In her opposition to defendants' motion, plaintiff submits 17 inmate declarations plaintiff's exhibits J-Z).  Defendants object to each declaration on the following grounds: (1) hearsay; (2) speculation; (3) opinion; (4) and lack of personal knowledge.  As to some declarations, defendants also object that they are not relevant.  Upon review of the declarations, the court finds that these objections should be sustained.

/ / /

/ / /

## II.  STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

> Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).  It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  <u>See</u> Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, <u>see</u> <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>see</u> <u>Matsushita</u>, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  <u>See Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." <u>Anderson</u>, 477 U.S. at 251.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## III.  DISCUSSION

In their motion for summary judgment, defendants argue that plaintiff cannot prevail on any of her claims.  They also argue that they are entitled to qualified immunity.

### A.  **Federal Law Claims**

In Claim 3, plaintiff alleges that defendants violated her rights to equal protection. In Claim 4, plaintiff alleges that defendants retaliated against her in violation of her First Amendment rights.  In Claim 5, plaintiff alleges violations of her due process rights.  And in Claim 6, plaintiff alleges that defendants conspired to violate her civil rights.

#### 1.    Equal Protection

Equal protection claims arise when a charge is made that similarly situated individuals are treated differently without a rational relationship to a legitimate state purpose. See San Antonio School District v. Rodriguez, 411 U.S. 1 (1972).  Prisoners are protected from invidious discrimination based on race.  See Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Racial segregation is unconstitutional within prisons save for the necessities of prison security and discipline.  See Cruz v. Beto, 405 U.S. 319, 321 (1972) (per curiam).  Prisoners are also protected from intentional discrimination on the basis of their religion.  See Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997).  Equal protection claims are not necessarily limited to racial and religious discrimination.  See Lee v. City of Los Angeles, 250 F.3d 668, 686-67 (9th Cir. 2001) (applying minimal scrutiny to equal protection claim by a disabled plaintiff because the disabled do not constitute a suspect class) see also Tatum v. Pliler, 2007 WL 1720165 (E.D. Cal. 2007) (applying minimal scrutiny to equal protection claim based on denial of in-cell meals where no allegation of race-based discrimination was made); Hightower v. Schwarzenegger, 2007 WL 732555 (E.D. Cal. March 19, 2008).

/ / /

/ / /

/ / /

1    In order to prevail on a § 1983 claim based on a violation of the Equal Protection

2    Clause of the Fourteenth Amendment, a plaintiff must show that defendants acted with

3    intentional discrimination against plaintiff, or against a class of inmates which included plaintiff,

4    and that such conduct did not relate to a legitimate penological purpose.  See Village of

5    Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (holding that equal protection claims may be

6    brought by a "class of one"); Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir.

7    2000); Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998); Federal Deposit Ins. Corp. v.

8    Henderson, 940 F.2d 465, 471 (9th Cir. 1991); Lowe v. City of Monrovia, 775 F.2d 998, 1010

9    (9th Cir. 1985).

10    At their depositions, defendants each denied any discriminatory intent behind their

11    conduct.  Further, plaintiff has admitted that she has no evidence of any such intent.  Therefore,

12    the court agrees with defendants that there is no genuine dispute as to this material fact.

13    Moreover, as defendants note, plaintiff has not established that she is a member of a protected

14    class.   Contrary to plaintiff's admittedly unsupported allegation that defendants discriminated

15    against her, the undisputed evidence shows that plaintiff was denied access to the PCS program

16    due to the incident involving inmate Koopman.

17        2.    Retaliation

18    In order to state a claim under 42 U.S.C. § 1983 for retaliation, the prisoner must

19    establish that he was retaliated against for exercising a constitutional right, and that the

20    retaliatory action was not related to a legitimate penological purpose, such as preserving

21    institutional security.  See Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).

22    In meeting this standard, the prisoner must demonstrate a specific link between the alleged

23    retaliation and the exercise of a constitutional right.  See Pratt v. Rowland, 65 F.3d 802, 807 (9th

24    Cir. 1995); Valandingham v. Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989).  The prisoner

25    must also show that the exercise of First Amendment rights was chilled, though not necessarily

26    silenced, by the alleged retaliatory conduct.  See Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir.

1    2000), see also Rhodes v. Robinson, 408 F.3d 559, 569 (9th Cir. 2005).  Thus, the prisoner

2    plaintiff must establish the following in order to state a claim for retaliation: (1) prison officials

3    took adverse action against the inmate; (2) the adverse action was taken because the inmate

4    engaged in protected conduct; (3) the adverse action chilled the inmate's First Amendment

5    rights; and (4) the adverse action did not serve a legitimate penological purpose.  See Rhodes,

6    408 F.3d at 568.

7            As with plaintiff's equal protection claim, her retaliation claim is based on

8    speculation.  She admitted at her deposition that she had no evidence that she suffered any

9    adverse consequences – other than being denied access to the PCS program – because she

10   engaged in any protected conduct.  As to being denied access to the PCS program, the undisputed

11   evidence shows that plaintiff was denied access because she violated the PCS policies and

12   guidelines, an obviously legitimate penological reason.

13            3.    Due Process

14           The Due Process Clause protects prisoners from being deprived of life, liberty, or

15   property without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  In order to

16   prevail on a claim of deprivation of due process, a plaintiff must first establish the existence of a

17   liberty or property interest for which the protection is sought.  See Ingraham v. Wright, 430 U.S.

18   651, 672 (1977); Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972).  Due process protects against

19   the deprivation of property where there is a legitimate claim of entitlement to the property.  See

20   Bd. of Regents, 408 U.S. at 577.  Protected property interests are created, and their dimensions

21   are defined, by existing rules that stem from an independent source – such as state law – and

22   which secure certain benefits and support claims of entitlement to those benefits.  See id.

23

24   / / /

25   / / /

26   / / /

1      Liberty interests can arise both from the Constitution and from state law.  <u>See</u>

2  <u>Hewitt v. Helms</u>, 459 U.S. 460, 466 (1983); <u>Meachum v. Fano</u>, 427 U.S. 215, 224-27 (1976);

3  <u>Smith v. Sumner</u>, 994 F.2d 1401, 1405 (9th Cir. 1993).  In determining whether the Constitution

4  itself protects a liberty interest, the court should consider whether the practice in question ". . . is

5  within the normal limits or range of custody which the conviction has authorized the State to

6  impose."  <u>Wolff</u>, 418 U.S. at 557-58; <u>Smith</u>, 994 F.2d at 1405.  Applying this standard, the

7  Supreme Court has concluded that the Constitution itself provides no liberty interest in good-

8  time credits, <u>see Wolff</u>, 418 U.S. at 557; in remaining in the general population, <u>see Sandin v.</u>

9  <u>Conner</u>, 515 U.S. 472, 485-86 (1995); in not losing privileges, <u>see Baxter v. Palmigiano</u>, 425

10  U.S. 308, 323 (1976); in staying at a particular institution, <u>see Meachum</u>, 427 U.S. at 225-27; or

11  in remaining in a prison in a particular state, <u>see Olim v. Wakinekona</u>, 461 U.S. 238, 245-47

12  (1983).

13      In determining whether state law confers a liberty interest, the Supreme Court has

14  adopted an approach in which the existence of a liberty interest is determined by focusing on the

15  nature of the deprivation.  <u>See Sandin v. Connor</u>, 515 U.S. 472, 481-84 (1995).  In doing so, the

16  Court has held that state law creates a liberty interest deserving of protection only where the

17  deprivation in question: (1) restrains the inmate's freedom in a manner not expected from the

18  sentence; and (2) "imposes atypical and significant hardship on the inmate in relation to the

19  ordinary incidents of prison life."  <u>Id.</u> at 483-84.  Prisoners in California have a liberty interest in

20  the procedures used in prison disciplinary hearings where a successful claim would not

21  necessarily shorten the prisoner's sentence.  <u>See Ramirez v. Galaza</u>, 334 F.3d 850, 853, 859 (9th

22  Cir. 2003) (concluding that a due process challenge to a prison disciplinary hearing which did not

23  result in the loss of good-time credits was cognizable under § 1983); <u>see also Wilkinson v.</u>

24  <u>Dotson</u>, 544 U.S. 74, 82 (2005) (concluding that claims which did not seek earlier or immediate

25  release from prison were cognizable under § 1983).

26  / / /

1         As with plaintiff's other claims arising from the denial of her application to work

2  as a volunteer in the PCS facility, plaintiff admits that she cannot identify any due process

3  violations in connection with the denial.

4         4.    <u>Conspiracy</u>

5         Plaintiff stated in her deposition that she can only speculate as to the existence of

6  a conspiracy.  Given this, and in light of defendants' denials that they formed any agreement to

7  deprive plaintiff of her civil rights, it is undisputed that no such agreement existed.  Therefore,

8  plaintiff cannot prevail on her conspiracy claim.

9      **B.**    **State Law Claims**

10         In Claim 1, plaintiff alleges that defendants Knauf and Clanton defamed her.    In

11  Claim 2, plaintiff alleges that defendants' conduct violated California Government Code §

12  11135.  Because, as discussed above, the court finds no basis for liability on any of plaintiff's

13  federal law claims, there is no basis for supplemental jurisdiction over plaintiff's state law

14  claims, which should be dismissed.

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

**IV.  CONCLUSION**

Plaintiff, unhappy with the consequences of her actions with respect to inmate Koopman, speculates that the denial of her application to volunteer in the PCS program was based on discrimination, resulted from a conspiracy, violated due process, and denied her equal protection.  The undisputed evidence does not support any of these claims.  Based on the foregoing, the undersigned recommends that defendants' motion for summary judgment (Docs. 75 and 76) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


 DATED:  September 10, 2013


                                                                         _____
                                                                         **CRAIG M. KELLISON**
                                                                         UNITED STATES MAGISTRATE JUDGE

14